UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA | : CRIMINAL NO. 05-289 (RWR) |
| v. | : |
| KYRA T. WALKER, | : |
| Defendant. | : |

### GOVERNMENT'S MEMORANDUM IN AID OF SENTENCING

The United States of America, by and through its counsel, the United States Attorney for the District of Columbia, hereby submits in the above-referenced matter this memorandum in aid of sentencing of defendant Kyra T. Walker.

### I. FACTUAL BACKGROUND

On November 15, 2005, the defendant pled guilty to a one count Indictment charging receipt of bribes by a public official, in violation of 18 U.S.C. § 201(b)(2)(A) and (C).

As agreed to by the defendant and set fort in the Statement of Offense and the Presentence Investigation Report ("PSR"), at pages 5-6, at all times material to the Indictment, defendant was employed as a Clerk with the District of Columbia Department of Motor Vehicles (hereinafter referred to as "DMV") at the main office at 301 C Street, N.W., in Washington, D.C. Among the official duties of defendant Walker was that of processing applications from individuals seeking to obtain District of Columbia motor vehicle titles and registrations.

Beginning in or about November 2002 through May 2004, defendant, while employed as a DMV clerk, accepted bribes in the form of cash payments to produce titles and registrations for certain motor vehicles and to assist others working at the DMV to do the same. Defendant agreed to do this although she knew the vehicles were stolen, or did not have insurance, or had

other problems associated with them.  In some cases, defendant operated as a "runner" or "go-between," by accepting the cash payments and fraudulent documentation for vehicles that applicants wanted to register and delivering the payments and paperwork to another DMV employee so that DMV employee could enter the information from the paperwork into the DMV computer to create "clean" titles and registrations for the vehicles.  Many of the titles were mailed to the applicants based on the address found on the application.  Some of the same addresses were used on many different title applications.  Defendant took a portion of the money paid by the applicants for this service.  Defendant's share of the bribe money varied from $200 to $300 or more per transaction.

On other occasions, defendant accepted money and registered the vehicles herself.  In some cases, the middlemen seeking to register the stolen vehicles would provide defendant with the information they wanted entered into the computer, including the vehicle identification number (VIN), the name of the individual to whom they wanted the vehicle registered and an accompanying Social Security number.  In other cases, the middlemen would provide defendant with only a slip of paper with just the VIN, vehicle type, vehicle year and mileage written thereon, and she would take a name and social security number from a random citizen's application from an earlier transaction and use that information to complete the fraudulent title and registration.  Defendant told law enforcement that she utilized random citizens' identification information in this way on approximately ten occasions.

Defendant also told law enforcement that the middlemen with whom she worked mostly dealt in expensive, newer model vehicles.  For example, defendant stated that she could recall acting as a go-between for another DMV employee who issued titles and registrations for these

middlemen on approximately five to ten Mercedes Benz automobiles. Defendant stated that, on average, a middleman paid $1,000 per vehicle for title and registration; though defendant stated that she would take $200 to $300 for each vehicle. Defendant knew she was not entitled to receive or retain this money for her personal use, but did so nonetheless. She told law enforcement that she was involved in over 50 of these transactions.

Defendant also admitted to "helping out" car dealers who did not want to take vehicles through inspections, which they knew they would not pass. Additionally, dealers brought her paperwork for salvaged vehicles, including from Maryland, in order to receive "clean" District of Columbia titles, that is, titles without reference to any problems with the vehicles. By obtaining a "clean" title, the dealers were able to sell the vehicles for more money. Typically, the dealers would provide defendant applications for the vehicles, but would not provide other necessary documentation, including proof of insurance. The dealers on occasion gave defendant money and other gifts. Although defendant recognized she was acting illegally on their behalf, she contends that she did not consider the money and gifts she received from these car dealers as a quid pro quo for the transactions she completed for them at the DMV.

Defendant was terminated from her employment with DMV on May 4, 2004. As stated above, she pled guilty to the Indictment in this matter on November 15, 2005.

## II. UNITED STATES SENTENCING GUIDELINES

The United States Sentencing Guidelines, § 3E1.1, provides for a two-level decrease in a defendant's offense level for acceptance of responsibility, and, upon motion of the government, for a defendant whose level is 16 or greater and who has in a timely manner advised the government of the defendant's intent to plead guilty, an additional one-level decrease. The

3

defendant meets the criteria for a three-level decrease and the government hereby moves that she be given a three-level decrease in her offense level for acceptance of responsibility.

The probation officer believes, and the United States concurs, that the defendant's total offense level, incorporating the three-level decrease for acceptance of responsibility, is thirteen, her criminal history is I, and her guideline range is 12 to 18 months of imprisonment. PSR, at pages 7-8 , ¶¶ 23-35, and page 14, ¶ 71. According to the PSR, the defendant presently falls within Zone D of the Sentencing Table. Id., at page 15, ¶ 77. A Guidelines sentence in Zone D requires a sentence of imprisonment. Id.

### III. IMPACT OF U.S. v. BOOKER ON THE SENTENCING GUIDELINES

There are no facts involved in the calculation of defendant's sentence under the United States Sentencing Guidelines to which defendant did not admit in her guilty plea in this matter. Accordingly, there are no Sixth Amendment concerns in the calculation of her sentence under those Guidelines. However, the Supreme Court has now held that the Sentencing Guidelines are no longer mandatory. Nevertheless, for the reasons set forth below, the government requests that the Court use the Sentencing Guidelines in determining the sentence of defendant in this case.

In United States v. Booker, 125 S. Ct. 738 (2005), the Supreme Court held that the mandatory application of the United States Sentencing Guidelines violates the Sixth Amendment principles articulated in Blakely v. Washington, 124 S. Ct. 2531 (2004). In consequence, the Court invalidated the statutory provision that made the Guidelines mandatory: Title 18, United States Code, § 3553(b)(1). Booker, 125 S. Ct. at 756; United States v. Price, 409 F.3d 436, 442-43 (D.C. Cir. 2005). However, the Court expressly refused to invalidate the Guidelines in their entirety. To the contrary, the Court upheld the remainder of the Guidelines as a benchmark for

informing courts as to what would be a reasonable sentence for a particular defendant who has committed a particular crime. The sentence will then be subject to review by courts of appeals for "reasonableness." See Booker, 125 S. Ct. at 766; Price, 409 F.3d at 441, 442.

In Booker's wake, this Court must continue to resolve disputed questions of fact and law in order to calculate correctly a defendant's sentence under the existing Sentencing Guidelines. See Fed. R. Crim. P. 32(i)(3)(B) (court must rule on unresolved objections to the Presentence Report or determine that resolution not necessary to sentencing). "The district courts, while not bound to apply the Guidelines, must consult those Guidelines and take them into account when sentencing." Booker, 125 S. Ct. at 767 (citing 18 U.S.C.A. §§ 3553(a)(4)&(5) (Supp. 2004)). See Price, 409 F.3d at 442-43. In light of this mandate, it is plain that a sentence within the Guidelines, while not required, is presumptively reasonable. Not only is a sentence within the Guidelines range presumptively reasonable, it also accommodates the salutary goal, endorsed by both Congress and the Supreme Court, of meting out fair and uniform sentences.

The Guidelines, aiming to achieve the uniform and appropriate treatment of like crimes, represent the distillation of two decades of careful study of sentencing practices across the country, and correlate as well to the varying severity of crimes as defined by Congress. The Guidelines, consisting of offense characteristics and various grounds for departure, address the considerations relevant to sentencing, as articulated in Section § 3553(a), such as "the nature and circumstances of the offense and the history and characteristics of the defendant"; "the need for the sentence imposed – (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) to afford adequate deterrence to criminal conduct; (C) to protect the public from further crimes of the defendant; and (D) to provide the

5

defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner"; and "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." See United States v. Price, 409 F.3d at 442 (listing the factors that guide sentencing).

Indeed, the Sentencing Commission formulated the Guidelines only after initially canvassing prior sentencing practices and attempting to identify and assign weights to all the factors – both aggravating and mitigating – that judges traditionally used in determining an appropriate sentence.  See United States Sentencing Commission, Supplementary Report on the Initial Guidelines and Policy Statements 16-17 (1987); see also 28 U.S.C. 994(m) (requiring Commission to "ascertain the average sentences imposed . . . prior to the creation of the Commission"); Comprehensive Crime Control Act of 1984, S. Rep. No. 98-225, at 168 (Commission should produce a "complete set of guidelines that covers in one manner or another all important variations that commonly may be expected in criminal cases").  Moreover, since the Guidelines were adopted, the Sentencing Commission has continued to study district court and appellate sentencing decisions and to "modify its Guidelines in light of what it learns." Booker, 125 S. Ct. at 766; see id. at 767 (Sentencing Commission will continue "collecting information about actual district court sentencing decisions  . . . and revising the Guidelines accordingly").

It thus remains true that, absent unusual circumstances, the sentence in a criminal case should fall within the Guideline range as determined by this Court.  Every Supreme Court Justice in the various opinions in Booker recognized the express national policy goals, as articulated by Congress, that sentences be uniform across the country, to the extent possible, and that sentences be based on the offender's actual conduct and history.  See, e.g., id. at 761 (majority opinion of

6

Breyer, J.) ("Congress' basic goal in passing the Sentencing Act was to move the sentencing system in the direction of increased uniformity."); id. at 759 ("Congress' basic statutory goal – a system that diminishes sentencing disparity – depends for its success upon judicial efforts to determine, and to base punishment upon, the *real conduct* that underlies the crime of conviction."); id. at 783 (dissenting opinion of Stevens, J.) ("The elimination of sentencing disparity, which Congress determined was chiefly the result of a discretionary sentencing regime, was unquestionably Congress' principal aim."); id. at 789 (dissenting opinion of Scalia, J.) ("the primary objective of the Act was to reduce sentencing disparity").  Since the Guidelines represent the only extant benchmark to encourage uniformity and thus the only tool to implement the Congressional vision of sentencing uniformity and fairness, Guidelines range sentences are currently the only mechanism available to implement Congress' basic statutory goals.

Booker, to be sure, departs from the prior practice of automatic reversal that would have accompanied the failure to sentence a defendant within the Guidelines.  Such a sentence will now be reviewed instead for its "reasonableness."  See id. at 766; Price, 409 F.3d at 441, 442.  Nevertheless, the Guidelines – resulting as they do from years of study of sentencing practices, crime statistics, national crime policy, and consideration of the factors that inform sentencing, see 18 U.S.C. § 3553(a) – provide the most concrete yardstick against which to measure what would be reasonable.  Booker not only prevents courts from substituting their individual judgment about the appropriateness of the Guidelines range without explaining with specificity their reasoning, Booker also continues to subject the explanation of the decision to sentence outside of the correctly calculated range to a court of appeals reasonableness review.  See Section 3553(c) (mandating consideration of the Guidelines); Section 3553(c)(2) (mandating written

explanations for imposing a sentence outside of the applicable Guideline range); Section 3742(f)(1) (mandating court of appeals to set aside a sentence imposed as a result of an incorrect application of the Guidelines); Section 3742(f)(2) (mandating court of appeals to set aside a sentence outside the Guidelines range when the district court fails to provide a required statement of reason in the judgment and commitment order).

Fidelity to the Guidelines best accomplishes the purpose of fair and consistent sentencing and should occur absent unusual circumstances. In this case, no unusual circumstances exist that warrant an exception to the preference for Guidelines sentencing. Therefore, the government respectfully recommends that the Court sentence defendant according to the Guidelines. Within that framework, the government requests, for the reasons discussed herein and in the supplemental pleading under seal, that the Court sentence defendant within resulting Guidelines range of 12 to 18 months.

## IV.  RECOMMENDATION

Defendant pled guilty to a scheme involving a pattern of the payment of bribes in return for defendant issuing temporary or permanent vehicle registrations, tags and titles at reduced rates or no fee at all, at times by lowering the value of a vehicle to reduce the amount of excise tax required to be paid to the District of Columbia government before registering that vehicle. This conduct, with its resulting harm to the District of Columbia government, is serious conduct that needs to be adequately punished. Moreover, beyond the financial loss to the D.C. government, the corruption of a public service institution itself is a wrong. Corruption by public officials in the District of Columbia, at whatever level, is a serious and, unfortunately, too often recurring matter. Corruption erodes the public confidence in government officials, employees

and institutions. Citizens will accept a system they believe operates fairly, but not one that they do not believe does so. Moreover, although most public servants are honest and hard working, their morale is hurt by those who engage in corruption and their reputations suffer.

In this case, the government is requesting that the Court sentence defendant within the resulting sentencing range of 12 to 18 months in Zone D. The government defers to the Court as to the appropriate sentence within the Guidelines.

### VI. CONCLUSION

WHEREFORE, the government respectfully requests that the Court sentence defendant within the resulting Sentencing Guidelines range after granting her a three-level reduction for acceptance of responsibility.

Respectfully submitted,

KENNETH L. WAINSTEIN
UNITED STATES ATTORNEY
D.C. Bar Number 451058


By: _____
ROBERT BOWMAN
D.C. Bar Number 417176
DANIEL P. BUTLER
D.C. Bar Number 417718
ASSISTANT U.S. ATTORNEYS
555 4th Street, N.W.
Washington, D.C. 20530
(202) 353-2877 and (202) 353-9431
Robert.Bowman@usdoj.gov
Daniel.Butler@usdoj.gov