# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| **v.** | : | **CR-05-289-01 (RWR)** |
| **KYRA TENEAL WALKER** | : | |

## DEFENDANT'S SENTENCING MEMORANDUM

On November 15, 2005, Ms. Kyra Teneal Walker, the defendant, pled guilty before this Honorable Court to one count of receipt of a bribe by a public official in violation of 18 U.S.C. § 201(b)(2)(A). She will appear before this Honorable Court for sentencing on January 30, 2006. Ms. Walker, through undersigned counsel, respectfully submits the following objections for the Court's consideration in determining a reasonable sentence. See United States v. Booker, __ U.S. __, 125 S.Ct. 738, 768 (2005) (sentences reviewable only for reasonableness).

### Factual Background

Ms. Walker is a 27 years old mother of an eleven year old boy, who has successfully struggled to overcome -- and protect her son from -- the life of drug addiction and poverty into which she was born. She grew up in Washington, D.C., and has never before been convicted of a criminal offense.

Her father left her mother when she was only a few months old, and she did not see him again until she was twenty-two years old. She lived with her mother, her grandmother and her aunt. Ms. Walker was very close to her grandmother, whom she considered a second mother.

When Ms. Walker was a very young child, her aunt was addicted to illegal drugs. Because of her aunt's addiction, as Ms. Walker describes, she saw many things that a young child

simply should not see.  Ms. Walker does not know exactly what drugs her aunt used, but she remembers seeing needles in the house and frequently hearing her grandmother and her aunt arguing about her aunt stealing money.

Eventually, her mother got her own apartment, and Ms. Walker moved with her to an apartment a few blocks from her grandmother's home.  When Ms. Walker was in the seventh grade, her mother became addicted to prescription medications and stopped going to work.  Ms. Walker's grandmother struggled to continue to support the family, and Ms. Walker became her mother's caretaker.  She recalls returning home from school and finding that her mother had done nothing all day.  Ms. Walker became responsible for the cooking and cleaning.

Ms. Walker's mother's failure to maintain a safe environment for her child led to the most tragic incident of Ms. Walker's life, which is noted in paragraph 40 of the Presentence Investigation Report.  She was just fifteen years old at the time.  She was scared and never told her mother about the incident.

On November 24, 1994, when she was just sixteen-years-old, she gave birth to her son, Kyron.  Since that time, Ms. Walker has struggled to finish school, work and support her son. Although she was very young when he was born and raising him has been demanding, she considers herself very fortunate to have her son, and he is the center of her life.

When her son was born, her mother was still addicted to prescription medication and not working.  This was a very difficult time.  At just sixteen years old, she not only was working and going to school, she also had to care for her baby and her mother.  Kyron's father provided little help when Kyron was a baby.  When Kyron was eleven months old, his father joined the military

2

and was stationed in Eygpt.  In part because his father had six other children by other women,

over the years he has provided little help to Ms. Walker.

Despite the difficulties confronting her, in 1996, Ms. Walker graduated with honors from

Roosevelt High School.  After graduation, she began taking classes at the University of the

District of Columbia, but did not continue because she needed to work and support her son.

After graduating from high school, she worked in the records office at the University of

the District of Columbia and did hair part-time to earn extra money.  She obtained a full-time

position with PHP Healthcare in 1997, where she worked until she obtained a job at CVS in

1999.  She worked at CVS until she was hired at the Department of Motor Vehicles ("DMV") in

2000.

A little more than a year before she obtained the job at the DMV, in February 1999, Ms.

Walker's grandmother had a heart attack and died.  Ms. Walker was devastated by the loss of the

one person who had unselfishly supported her throughout her life.  She was so upset by the loss

of her grandmother that she put her hand through a glass pane at the hospital and had to be

sedated and hospitalized.

A short time after the death of her grandmother, her mother got very ill and was

hospitalized.  The doctors struggled for months to determine the cause of her mother's illness.

Eventually, she was diagnosed with Lupas.  Ms. Walker continues to help care for her mother,

who suffers from severe joint pain which impairs her mobility.

In 2001, Ms. Walker became involved with a man whom she thought she could trust.

Eventually, however, this man became very abusive, verbally and physically.  Ms. Walker

understands now that it was an abusive relationship, but at the time she believed that this man loved her and she repeatedly went back to him after being physically abused.

It was during this time period that the offense at issue began.  Ms. Walker was working at the DMV for more than two years when she was approached by several car dealers with whom she had become friends.  They began to ask her to register cars without all of the necessary paperwork.  Ms. Walker knew that other employees were doing similar things, and she agreed to do it.  Later, Ms. Walker's best friend's cousin -- and his best friend -- asked her to help him register several cars that were not properly insured.  These men had a close relationship with her best friend, and they all lived in the same neighborhood.  Ms. Walker agreed to help them.  No money was exchanged for these initial transactions.  Later, however, Ms. Walker's best friend's cousin wanted Ms. Walker to help him obtain titles for cars for which he did not have the necessary documents.  Ms. Walker did not have access to the DMV equipment that would permit her to create titles.  At this man's request, Ms. Walker asked another woman who worked at the DMV to help him obtain the titles.  Ms. Walker believed that this woman was doing this for others.  When Ms. Walker asked her, the woman indicated that she wanted $200.00 for each car.  The man gave the money to Ms. Walker, and Ms. Walker gave the money to the other DMV employee, who obtained the titles.  Ms. Walker did not take any money for these transactions.  After several transactions, the other DMV employee was fired for unrelated incidents.

At this point, Ms. Walker's best friend's cousin wanted her to find someone else to help him obtain titles.  It was during this time period that this man's friend, with whom he had been working to obtain the titles, learned that his aunt, Toni Mahoney, also worked at the DMV.  The men discussed this with Ms. Walker.  Ms. Walker knew that Ms. Mahoney had been doing

similar transactions for other individuals and agreed to talk to her. Ms. Mahoney agreed to help.

The men gave Ms. Walker money and the information for the titles that they wanted. Because

Ms. Mahoney did not request a specific amount of money and did not know how much money

the men were giving, Ms. Walker would take some of the money and give the rest to Ms.

Mahoney, who obtained the documents the men requested.

Ms. Walker offers no excuses for her behavior. The culture within the DMV at the time

she worked there made it easy for her to ignore right and wrong. She saw others doing

transactions for friends and when asked, she did the same without much thought. It was wrong,

and she accepts full responsibility for it. She is ashamed of her behavior and terribly afraid of her

son learning of her actions because she does not want him to know she has done what she teaches

him is wrong.

Ms. Walker's regret for her actions came before she knew she was under investigation.

At sometime after she stopped receiving requests from the men, they came back to her with a

complaint. According to them, Ms. Mahoney had made a mistake, and they wanted her to

straighten it out. Ms. Walker tried to tell them that she could not, but they would not leave her

alone. Apparently, the men from whom she was taking money were working with other men.

One evening, her best friend's cousin came to her house. He was on his cellphone and then

turned on the speaker function. On the other end, was a very angry man, who threatened Ms.

Walker, teller her that he knew who she was and that she had better fix the mistake that "her girl"

had made. By this time, however, Ms. Mahoney was no longer working for the DMV, and there

was nothing Ms. Walker could do to fix the problem. She simply tried to avoid her best friend's

cousin and his friends.

In May 2003, Ms. Walker met her finance, Errick Wilson, and with his help she was able to get out of the abusive relationship. Over the passed several years, Mr. Wilson has helped Ms. Walker raise her son, and they plan to marry when he returns from military duty. He is a corporal in the Army and was recently promoted to the rank of sergeant. In November, 2005, he was deployed to Iraq, where he will be stationed for at least a year.

Fortunately, Mr. Wilson was with Ms. Walker when the men from whom she had accepted the money went further than telephone threats. On March 30, 2004, Ms. Walker came home to find her car on fire. At first, Ms. Walker believed it was her ex-boyfriend who may have done this, although it seemed odd that he would go to such lengths at this point. Several weeks later, she learned that it was not her ex-boyfriend. Ms. Walker's best friend was with her cousin (the man from whom Ms. Walker had accepted the money), while Ms. Walker was on the telephone with best friend. Ms. Walker could hear the cousin shouting that the men with whom he was working were not "playin'" and admitted that they had burned Ms. Walker's car, saying that that was just the beginning. Ms. Walker was terrified. She packed her things and moved herself and her son to a new apartment.

On May 4, 2004, when she was first contacted by the Metropolitan Police Department and the FBI about the DMV investigation, Ms. Walker agreed to talk to the police and admitted her participation in the offense. Although counsel had some discussions with government counsel and Ms. Walker and counsel met on one occasion with government counsel, because she was afraid for her safety, Ms. Walker chose not to enter into a pre-indictment plea, which would have required cooperation with the government. She had been threatened verbally and her car had been burned. She did not want to risk any harm coming to her son.

In December 2004, after Ms. Walker's employment at the DMV was terminated, Ms. Walker began working at Inphonic, as a cellular telephone sales person. She works there full-time.

The government obtained an indicted on August 3, 2005, and Ms. Walker pled guilty to the indictment on September 20, 2005. She will appear before the Court for sentencing on January 30, 2006.

<u>Argument</u>

The Presentence Investigation Report calculates the applicable sentencing range under the United States Sentencing Guidelines (hereinafter "Guidelines") as a range of 12 to 18 months incarceration. The Guidelines, of course, are not mandatory. The Court must only consider the Guidelines, along with the other factors set forth in 18 U.S.C. § 3553(a). <u>United States v. Booker</u>, __ U.S. __, 125 S.Ct. 738, 764 (2005). These factors include: "The nature and circumstances of the offense and the history and characteristics of the defendant; . . . the kinds of sentences available; . . . the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and . . . the need to provide restitution to any victims of the offense." 18 U.S.C. 3553(a). Pursuant to 18 U.S.C. § 3661,

> No limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purposes of imposing an appropriate sentence.

Following <u>Booker</u>, Courts need not justify sentences outside the applicable Guidelines range by citing an applicable Guidelines grounds for departure or factors that take the case outside the "heartland." Rather, as long as the sentence imposed is reasonable and supported by the factors

7

outlined in § 3553, the Court may disagree with the range proposed by the Guidelines and exercise discretion to impose a sentence outside the range.

After considering all of the factors set forth in § 3553(a), the Court must impose a sentence "that reflect[s] the seriousness of the offense, promote[s] respect for the law, provide[s] just punishment, afford[s] adequate deterrence, protect[s] the public, and effectively provide[s] the defendant with needed educational or vocational training and medical care." Id. at 765 (citing 18 U.S.C. § 3553(a)(2)).  Section 3582 of Title 18 provides:

> [t]he court, in determining whether to impose a sentence of imprisonment, and, if a term of imprisonment is to be imposed, in determining the length of the term, shall consider the factors set forth in Section 3553(a) to the extent that they are applicable, recognizing that imprisonment is not an appropriate means of promoting correction and rehabilitation.

With that limitation and considering all of the purposes of sentencing, the Court must impose a sentence that is "sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph [(a)](2) [of § 3553]."  18 U.S.C. § 3553(a).

A review of all of the applicable factors set forth in § 3553(a) demonstrates that a sentence of home confinement and supervised release would be a reasonable sentence in this matter.  The Guidelines are one of the factors that the Court should consider, but the Court should consider the reasonableness of those Guidelines in the context of the offense, Ms. Walker's background, her remorse and her need to care for her eleven-year-old son.

When considering Ms. Walker's character, the Court should consider that Ms. Walker has no prior convictions.  The offense at issue here is not characteristic of Ms. Walker.  Ms. Walker is a woman who has struggled to overcome a family life that was marked by neglect and abuse.

Despite the obstacles, she graduated from high school and has maintained employment. She has spent much of her life caring for her mother and her son. The offense at issue here was an aberration.

The Court should also consider that Ms. Walker now is the sole caretaker for her son. Her grandmother has passed away, and her fiancee is stationed in Iraq. Because she knows that she could be incarcerated, Ms. Walker has spoken to her mother about caring for her son if she must serve a prison sentence. Ms. Walker's mother is willing to care for her grandson, but Ms. Walker is concerned about her ability to adequately do so, given the unpredictability of her health – as noted above, Ms. Walker's mother's Lupus causes her to have severe joint pain, which impairs her mobility.

Mr. Walker has demonstrated her ability to do well under supervision, by abiding by the conditions of her release in this case. Her history and background demonstrate that she could successfully complete any term of home confinement and supervised release and that she is not a danger to the community. Such a sentence would serve as a significant punishment because it would limit her freedom within the community, including her ability to spend time outside her home with her son. A sentence of incarceration is not necessary to deter Ms. Walker from further criminal conduct. She has suffered through very specific threats as a result of her actions and through the humiliation of being charged, pleading guilty and now having a felony conviction. This alone has been a deterrent, and the additional punishment of home confinement and supervised release certainly would be sufficient to deter an future misconduct.

<u>Conclusion</u>

For the foregoing reasons, and such other reasons as may be presented at the sentencing hearing, Ms. Walker respectfully requests that the Court not impose a sentence of incarceration and impose a sentence of home confinement and supervised release.

Respectfully submitted,

/s/

_____

Mary Manning Petras
Assistant Federal Public Defender
625 Indiana Avenue, N.W.
Suite 550
Washington, D.C.   20004
(202) 208-7500

10